Mrs. Elizabeth Scott et al. v. Mrs. Georgia Scott Townsend.

No. 2664.   Decided May 20, 1914.

**1.—Evidence—Will—Undue Influence—Testator's Declarations.**

The issue as to the validity of a will being one of undue influence upon the testator, declarations by him, whether contemporaneous with or made a reasonable time after its execution, and bearing on his state of mind at the time, are admissible in proof, not of the exercise of such influence, but of its effect on the mind of the testator, which is an element material to the issue. (Pp. 331-336.)

**2.—Same.**

The issues as to testamentary capacity and undue influence exercised upon the mind of the testator are distinguished.   (Pp. 333, 334.)

**3.—Same—Cases Reviewed.**

Robinson v. Stuart, 73 Texas, 267; McElroy v. Phink, 97 Texas, 147; Kennedy v. Upshaw, 64 Texas, 411; and Rankin v. Rankin, 105 Texas, 451; discussed and distinguished. (P. 332.)

**4.—Will—Evidence—Hearsay.**

Declarations by a testator that his wife "had been after him to make a will" were mere hearsay as to the fact so asserted, were of no bearing on his state of mind resulting from such fact; and were improperly received on either issue. (Pp. 336, 337.)

**5.—Same—Restricting Operation of Evidence.**

A limitation placed by the court at the time testator's declaration (that his wife had been after him to make a will) was introduced, and by subsequent instructions, that it could be considered only upon the question of testator's state of mind, was insufficient to cure the error in its admission, since it in nowise tended to prove such state of mind, could have no effect except to establish the fact that influence was exerted, and on this issue could not be treated as harmless. (Pp. 337, 339.)

**6.—Will—Declarations of Testator—Hostile Feelings of Beneficiary to Contestant.**

Declarations of testator as to the existence of hostile feelings by his wife, beneficiary under his will, towards her step-daughter, who was contesting it on the ground of undue influence by the wife, were inadmissible to prove the fact of such hostile feeling. (Pp. 339, 340.)

**7.—Same—Declarations Admissible in Part.**

Where declarations of testator offered in evidence were partly admissible (tending to prove his state of mind) and partly inadmissible (being only hearsay, as recitals of the fact that influence was exerted) but were offered as a whole and objected to as a whole, they should have been excluded, or the introduction permitted of only such part as was admissible. (P. 340.)

**8.—Same.**

Where declarations of testator which were admissible and those not so were distinct, though offered together, the objection to the part inadmissible should be separately urged, or the admission of all should not be treated as a ground for reversal. But where the declaration appears to be entire and is so offered, there was no occasion for requiring separate objections to each part of it. (Pp. 340, 341.)

**9.—Proof of Undue Influence.**

That the wife of testator, shortly before the execution of the will which was contested on the ground of her undue influence, was urging him to execute some important legal papers and threatening him to take away their infant son in case of refusal, was competent evidence, though the testimony did not identify the will as the instrument in question. It was for the jury to determine whether this was the document of which she so sought to enforce the execution. Even if it was not, the compelling him to execute other instruments by such coercion was evidence bearing on the issue of undue influence on the will. (Pp. 341, 342.)

**10.—Same—Influence Not Exercised by Beneficiary.**

A will making the infant child of testator and his wife the principal beneficiaries, in disregard of the claims of his daughter by a former marriage, was contested on the ground of undue influence by the wife in procuring its execution. Held, that declarations by the wife showing animosity toward the step-daughter and desire to exclude her from the inheritance were admissible, not only against her, but against the infant beneficiary incapable of collusion.

The issue was as to the validity of the will as a whole, and declarations of the one charged with the acts invalidating it were admissible as showing motive. (Pp. 342-344.)

Error to the Court of Civil Appeals, Second District, in an appeal from Tarrant County.

Mrs. Townsend, joined by her husband, sued in the District Court to set aside the will of Winfield Scott, which the County Court had admitted to probate. Plaintiff had judgment, which was affirmed on appeal, by defendants, who then obtained writ of error.

*Capps, Cantey, Hanger & Short, Williams & Stedman,* and *A. J. Clendenin,* for plaintiffs in error.—The declarations of a testator, whether made before or after the execution of a will, are hearsay and inadmissible to prove the truth of such declarations, and where it is sought to set aside a will on the ground of undue influence, such declarations are not admissible as evidence that undue influence was exerted on the testator, or even to show that the will was procured thereby, but are only admissible as external manifestations of his mental condition. Rankin v. Rankin, 151 S. W., 527; Helsley v. Moss, 52 Texas Civ. App., 57; Gwynn v. Gwynn, 48 Pac., 295; 1 Underhill on Wills, sec. 161-163; Ormsby v. Webb, 134 U. S., 47.

As to what it takes to constitute the exercise of undue influence, see, in addition to the authorities above cited, the following: Salinas v. Garcia, 135 S. W., 591; Patterson v. Lamb, 52 S. W., 98; Barry v. Graciette, 71 S. W., 309; Robinson v. Stewart, 73 Texas, 267; Tyler v. Guardian, 53 N. Y., 559; Small v. Small, 16 Am. Dec., 253; In re Kilborn's Estate, 120 Pac., 762; In re Lavinburg's Estate, 119 Pac., 915, 918; Pickler v. Wise, 132 N. W., 815; In re Ricks Estate, 117 Pac., 532; Bracky v. Bracky, 130 N. W., 370; Converse v. Nix, 115 Pac., 305; In re Lankford, 108 Cal., 608; Smith v. Henline, 51 N. E., 227; Maynard v. Tyler, 46 N. E., 413; Latham v. Ludell, 38 Mich., 238. For late cases in which it was held that, for want of evidence of undue influence the court should have instructed a verdict in favor of the will, in some of which the evidence relied on to show undue influence exceeded anything found in this record, see: Barry v. Brown, 148 S. W., 1117; Hays v. Hays, 145 S. W., 1155; Schierbaum v. Schemme, 57 S. W., 526; Berry v. Graciette, 71 S. W., 309; In re Marcel's Estate, 121 Pac., 733; Arnold v. Livingston, 134 N. W., 101; Converse v. Nix, 115 Pac., 305.

No presumption of undue influence between husband and wife. Page on Wills, sec. 410, and cases there cited.

No presumption of undue influence from the fact that beneficiary had opportunity to exert it, nor from inequality of distribution. Page on Wills, sec. 421, and cases cited.

Winfield Scott, Jr., being the principal beneficiary of the will of Winfield Scott, deceased, the declarations of Mrs. Elizabeth Scott, another beneficiary, who, however, had not accepted any benefit under the will, were hearsay and inadmissible as evidence in this case. See: Helsley v. Moss, 113 S. W., 599, in which writ of error was denied;

Ormsby v. Webb, 134 U. S., 47 (L. Ed.), book 33, p. 51; Seibert v. Hatcher, 102 S. W., 962; Schierbaume v. Schemme, 57 S. W., 526; Eastis v. Montgomery, 9 So., 311; Dale's Appeal, 117 Atl., 757; Campbell v. Campbell, 28 N. E., 1080; Parsons v. Parsons, 21 N. W., 570; Mayes v. Burkam, 67 Ind., 359; Thompson v. Thompson, 13 Ohio St., 353; Chadwick v. Haley, 81 Texas, 617.

*McLean, Scott & McLean* and *Spoonts, Thompson & Barwise,* for defendants in error.—It is affirmatively shown by the defendant in error in this record that the error, if such it be, was entirely harmless, and should not operate a reversal. Railway Co. v. Greathouse, 82 Texas, 108; Eborn v. Zimpelman, 47 Texas, 522; Dewees v. Bluntzer, 70 Texas, 408.

When it is kept in mind that under the particular facts of Rankin v. Rankin there was no evidence to show fraud and undue influence, likewise no evidence to show mental unsoundness, there will be no occasion to ascribe to that decision a purpose to overturn the rule relating to the admissibility of declarations in this class of cases so long established in Texas, and in every other State. Under the interpretation of this decision given by counsel for plaintiffs in error, it results that the following Texas cases have been directly overruled: Johnson v. Brown, 51 Texas, 80; Robinson v. Stuart, 73 Texas, 267; McElroy v. Phink, 97 Texas, 147; Stubbs v. Marshall, 117 S. W., 1030; Goodloe v. Goodloe, 105 S. W., 535.

The following list of cases, showing the state in which they were decided, hold such declarations admissible, viz: Mooney v. Olsen, 22 Kan., 78; Collagan v. Burns, 57 Maine, 449; Hoppe v. Byers, 60 Md., 381; Shailer v. Bumstead, 99 Mass., 112; May v. Bradlee, 127 Mass., 420; Pickens v. Davis, 134 Mass., 257; Giles v. Giles (Mass.), 90 N. E., 598; Lawyer v. Smith, 8 Mich., 412; Harring v. Allen, 25 Mich., 505; Hope's Appeal, 48 Mich., 518, 12 N. W., 682; Re Estate Lambie, 97 Mich., 50, 56 N. W., 223; Cheever v. North, 106 Mich., 390, 64 N. W., 455; Ewing v. McIntyre (Mich.), 104 N. W., 787; Brush v. DeLano, 113 Mich., 321, 71 N. W., 628; Tucker v. Whitehead, 59 Miss., 594; Sheehan v. Kearney, 82 Miss., 688, 21 So., 41; Thompson v. Tal, 99 Mo., 160, 12 S. W., 510; Crowson v. Crowson, 172 Mo., 691, 72 S. W., 1065; Williams v. Mills (Neb.), 96 N. W., 152; Clark v. Turner (Neb.), 69 N. W., 843; Mavagle v. Parker (New Hamp.), 71 Atl., 639; Linebarger v. Linebarger, 143 N. C., 229; Re Miller's Will (Ore.), 90 Pac., 1008; Re Turner (Ore.), 93 Pac., 461; Swope v. Donnelly (Pa.), 42 Atl., 882, and cases cited; Gardner v. Gardner, 177 Pa., 218, 35 Atl., 558; Neel v. Potter, 40 Pa., 483; Hobson v. Moonman (Tenn.), 90 S. W., 152; Re Miller, 31 Utah, 415; 88 Pac., 338; Fairchild v. Bascomb, 35 Vt., 398; Waller v. Waller (Va.), 57 S. E., 596; Jackson v. Hewlett (Va.), 77 S. E., 521; Harris v. Harris (Wash.), 39 Pac., 150; Gavitt v. Moulton (Wis.), 96 N. W., 400; Re Steinlee's Will (Wis.), 90 N. W., 61; Re Valentine's Will (Wis.), 67 N. W., 12; Leslie v. McMurty, 60 Ark., 301, 30 S. W., 33; Flower v. Flowers (Ark.), 85 S. W., 244; Gilbert v. Gilbert, 22 Ala., 529, 58 Am. Dec., 268; Coghill

v. Kennedy, 119 Ala., 641, 24 So., 459; Re Thomas Estate (Cal.), 101 Pac., 800; Spencer Case (Conn.), 60 Atl., 291; Denison's Appeal, 29 Conn., 399; Cavada's Appeal, 47 Conn., 463; Burge v. Ham, 72 Ga., 568; Page v. Maxwell (Ill.), 8 N. E., 853; Baker v. Baker (Ill.), 67 N. E., 410; Re Koh (Iowa), 113 N. W., 563; Johnson v. Johnson (Iowa), 111 N. W., 430; Tannert v. Murphy (Iowa), 112 N. W., 236; Smith v. Ryan (Iowa), 112 N. W., 8; Gay v. Gay (Iowa), 14 N. W., 238; Re Townsend (Iowa), 97 N. W., 1108; Stephenson v. Stephenson (Iowa), 17 N. W., 456; Re Wiltsey, 122 Iowa, 423, 98 N. W., 294.

. The following authorities are submitted as sustaining the proposition that the declarations against interest of a beneficiary who is a party to the suit, and as to such declarations as are against interest, are admissible, although they may affect other joint beneficiaries in the will. Lewis v. Mason, 109 Mass., 169; Shephardson v. Potter (Mich.), 18 N. W., 575; Saunder's Appeal (Conn.), 6 Atl., 193; Gibson v. Sutton (Ky.), 70 S. W., 188; Lundy v. Lundy (Iowa), 92 N. W., 39; Peeples v. Stevens (S. C.), 64 Am. Dec., 750; Davis v. Calvert (Md.), 25 Am. Dec., 282; see, also, Mason v. Paulson, 40 Md., 355; Williamson v. Nabers, 14 Ga., 286, 12 Ga., 69, 51 Ga., 24; Brown v. Moore, 14 Tenn., 272; Crocker v. Chase's Estate, 57 Vt., 413; Horn v. Pullman, 10 Hun, 471; Re Budlong, 54 Hun, 131.

The principle which subjects the title of even an innocent principal to the hazard of the admission in evidence of the fraudulent acts, declarations, etc., of the self-constituted agent, and which principle, we submit, by analogy is applicable to this transaction, is illustrated by the following authorities: Wilson v. Tumman, 6 Man. & G., 236; Morse v. Ryan, 26 Wis., 356; Kerr on Fraud and Mistake, 111; Bigelow on Fraud, 367; Broom's Legal Maxims, 708; Wharton on Agency, secs. 89, 90; Fitzsimmons v. Joslin, 21 Vt., 142, 52 Am. Dec., 46; Baker v. Union Mut. L. Ins. Co., 43 N. Y., 283; Elwell v. Chamberlain, 31 N. Y., 611; Presby v. Parker, 56 N. H., 409; Garner v. Mangam, 93 N. Y., 642; Bennett v. Judson, 21 N. Y., 238; Carpenter v. Insurance Co., 1 Story, 57; Mundorff v. Wickersham, 63 Pa. St., 87, 3 Am. St., 531; Coleman v. Stark, 1 Ore., 115; (Busch v. Wilcox (Mich.), 21 Am. St., bottom of p. 565); Hobson v. Moorman, 5 Am. & Eng. Anno. Cases, 161, note.

MR. JUSTICE PHILLIPS delivered the opinion of the court. .

The case is before the court on petition for writ of error, filed in the Court of Civil Appeals prior to July 1, 1913, to have reviewed the judgment of the Honorable Court of Civil Appeals for the Second District, affirming the judgment of the District Court of Tarrant County setting aside the probate by the County Court of an instrument therein admitted to probate as the last will of Winfield Scott, and annulling it. Answer having been made to the petition we may determine the case.

The suit was instituted by Mrs. Georgia Scott Townsend, the daughter of Scott, joined by her husband, the substance of the allegations of her petition in the District Court being that the execution of the purported will, which was dated September 29, 1909, was procured by Mrs. Elizabeth

Scott, the second wife of Scott and who survived him, through undue influence by her exerted which he was unable to resist and of which the will was the immediate result; that it did not represent his own will in respect to the disposition of his estate, but the wishes and will of Mrs. Elizabeth Scott, whose purpose was to accomplish practically the disinheritance of the contestant, Mrs. Townsend, and make herself and the minor son of herself and Scott, Winfield Scott, Jr., the chief bene-ficiaries of his estate. Allegations were also made of Scott's want of mental capacity at the time the will was made, and that Mrs. Scott procured the execution of the will by fraudulently agreeing to herself execute a will, which she failed to do; but in the District Court the only issue made by the contest submitted to the jury was that of undue influence. The contest failed in the County Court, but, as stated, the judgment of the District Court on a jury verdict was favorable to the contestant.

For a proper understanding of the questions dealt with in this opinion and their relation to the issue presented by the contest, the following is a sufficient statement of the case as gained from the findings of the Honorable Court of Civil Appeals.

The testator, Winfield Scott, was a man of robust physique, strong willed, of good business judgment, and had accumulated by his own efforts his entire fortune of approximately three million dollars, accord-ing to the inventory and appraisement filed in connection with the pro-bate of his will, his indebtedness at the time of his death, after the application of $100,000 collected upon life insurance policies and used for that purpose, being approximately $800,000. He was in a normal condition of mind at the time he executed the will in dispute and at all other times to the date of his death; and there was no evidence in-troduced upon the trial indicative of his want of testamentary capacity. His first marriage was in 1877. The only child of that marriage was the contestant, Georgia Scott Townsend, who was born in 1878, a few weeks before the death of her mother. In the year 1884 he married Mrs. Elizabeth Scott, the mother of Winfield Scott, Jr., the only child of that marriage, born in November, 1901, and accordingly about eight years old at the time of the execution of the will in September, 1909.

Following the death of her mother in 1878, Mrs. Townsend lived with her grandparents in Missouri, until September, 1886, when she was placed by her father and step-mother, Mrs. Elizabeth Scott, in the Ursuline Convent, a school at Dallas, Texas. She attended this school for several years, thereafter living with her father and Mrs. Scott until her marriage in 1897 with John T. Carter, which was contracted in opposition to the wishes both of her father and Mrs. Scott. During this marriage she lived in Dallas. She married her present husband, John R. Townsend, in 1905, their minor child being the Winfield Scott Townsend referred to in the will.

On March 4, 1898, Mrs. Townsend, then Mrs. John T. Carter, joined by John T. Carter, executed to her father a deed conveying to him her inherited interest in the community estate of his first marriage. It

recited that her father had maintained and supported her, and had, on March 12, 1895, conveyed to her lots 1 and 2 in block 115 in the City of Fort Worth, with a frontage of fifty feet on Main Street, which had cost him approximately fifteen thousand dollars and upon which he was then erecting a three-story brick building for her; and that the conveyance it expressed was made for such consideration and the further consideration that her father should complete the building on the lots named. It also contained this recital: "In connection with the consideration for this instrument, it is understood that the said lots Nos. 1 and 2, with the building being erected thereon, is of value far in excess of the interest which the said Mrs. Jno. T. Carter inherited from her mother. (Of course this instrument is not intended in any way to affect the interest of the said Mrs. Jno. T. Carter as one of the heirs at law in the estate of the said Winfield Scott on his death.)"

On April 6, 1903, her father conveyed to Mrs. Townsend, then Mrs. Carter, lots 8 and 16 in block B-7, Daggett's Addition to the City of Fort Worth, extending between Main and Houston Streets with a depth of two hundred feet and a frontage of fifty feet upon each street, reciting as its consideration her and her husband's conveyance to her father of lots 1 and 2 in block 115, which, as stated, had been conveyed to her in 1895. Scott gave to Mrs. Townsend during her first marriage a home in Dallas costing eight thousand dollars, and later another home in Colorado Springs, Colorado, costing eleven thousand five hundred dollars, and from time to time money for her personal expenses, automobiles, a horse and buggy, jewelry, etc.

The will was executed by Scott in September, 1909, as stated, at Fort Worth, approximately two years before his death, which occurred at Fort Worth in October, 1911. At the time of its execution he was temporarily residing with his wife and minor son in St. Louis, Missouri, later resuming his residence at Fort Worth. He had spent the summer of that year in Europe with Mrs. Scott and the boy, Winfield Scott, Jr., accompanied by a colored nurse, Rose Hill, the witness hereafter referred to by that name, the party returning to St. Louis early in September. After his return he made a trip to Fort Worth, arriving there about September 24th, and while there the will was prepared, and on the 29th of September, 1909, executed. A few days before the date of its execution Scott carried to Judge George Miller, his attorney, a former will executed in 1905, and then in force, with a list of the property he desired to devise to each beneficiary, and employed and directed him to prepare the will in controversy. It was prepared by Judge Miller accordingly, with a codicil attached to the original draft at Scott's specific direction, the will and the codicil both being read over to him before execution. At this time Mrs. Elizabeth Scott was in St. Louis, her return to Fort Worth not occurring until the January following.

The beneficiaries named in the will are the testator's wife, Mrs. Elizabeth Scott, his son, Winfield Scott, Jr., his daughter, Mrs. Townsend, the contestant, and her son, Winfield Scott Townsend. Mrs. Scott and

A. B. Robertson, a business associate of the testator, were named as executors.

The will recites that a large part of the property held by the testator was community property of himself and Mrs. Elizabeth Scott; that he had theretofore caused to be transferred to her as her separate property certain lots in the City of Fort Worth, designated in the will, which had been paid for out of their community funds, and which were of the aggregate value of $500,000. There follows this recital a devise to Mrs. Elizabeth Scott of specific property in Fort Worth. By a further provision the residue of his estate remaining after the payment of all debts and expenses of executing the will and not specifically disposed of by the will was devised to Mrs. Scott. The value of the property devised to Mrs. Scott, as fixed by the appraisers, was approximately $355,000.

In respect to Mrs. Townsend the will recites that the value of the community estate of the testator and her mother, his first wife, was approximately twenty thousand dollars; that during her infancy he had supported and educated her in a manner suitable to her social station and at an expense of more than the income of her part of such community estate, and that in settlement of her interest in the community estate of her mother and himself and as an advancement out of his own estate he had given her lots 8 and 16 in block B-7, Daggett's Addition to the City of Fort Worth,—the same property described in his deed to her of April 6, 1903, above referred to, and in return for which conveyance it appears Mrs. Townsend, then Mrs. Carter, had deeded to him the property previously conveyed to her by his deed of March 12, 1895,—which were of the value of more than $200,000; and that he had also given her a home in Denver, Colorado, wherein she then resided with her husband and son, of the value of $15,000. There follows this recital a devise to Mrs. Townsend of a life share in four and a fraction lots in Fort Worth, specifically described, with remainder over after death to her son, Winfield Scott Townsend, and any other child or children thereafter born to her, upon which the appraisers fixed a valuation of approximately $90,000.

It was shown that the separate property of Mrs. Elizabeth Scott, which the will recites as having been previously transferred to her, yields in rents approximately $2500 per month. And that the property recited in the will as having been previously given by the testator to Mrs. Townsend, viz: lots 8 and 16 in block B-7, Daggett's Addition in the City of Fort Worth, still owned by her at the time of the testator's death, was before that time yielding in rents $1000 per month.

The property devised by the will to Winfield Scott, Jr., consisted of property in Fort Worth, specifically described, and all lands then owned by the testator or which might thereafter be acquired by him in Tarrant County outside of the corporate limits of Fort Worth, and in Johnson and Parker Counties, constituting his ranch. The valuation fixed by the appraisers upon this property was approximately $1,675,000.

The devise to Mrs. Elizabeth Scott is absolute, but with the request

that she not sell or encumber the property and that she devise it to Winfield Scott, Jr., in which connection expression is made of the testator's absolute confidence in her. The devise to Winfield Scott Townsend of the remainder of the estate in the property devised to Mrs. Townsend for life, is upon the condition that he shall not have the power to sell, convey or encumber it or dispose of it otherwise than by will; that if he shall die intestate and without issue, it shall pass to the heirs of the testator's body; and if he shall attempt to encumber it the property shall revert to the heirs of the testator's body and be disposed of as provided for the residue of his estate. The devise to Winfield Scott, Jr., is upon the condition that he shall have no power to sell, convey or encumber any of the real estate devised to him or to dispose of it otherwise than by will; that if he dies intestate and without issue before reaching the age of fifty years, such property shall pass to the heirs of the testator's body; and that should he attempt to encumber it, it shall revert to the heirs of the testator's body and be disposed of as provided for the residue of the estate. It is further provided in the will that if any other child or children are born to the testator and Mrs. Elizabeth Scott, they shall share equally with Winfield Scott, Jr., in the property devised to him and subject to the same conditions attached to such devise; and that if Mrs. Townsend dies leaving no child surviving her the remainder of the estate in the property devised to her for life shall vest in such of the testator's heirs at law as are then living, subject to the conditions contained in the will with reference to specific devises to such heirs at law. A bequest of $10,000 is made to A. B. Robertson as compensation for his services as executor. The sum of $10,000 is set apart for the payment of attorney's fees to maintain the will in the event it should be contested. And it is further provided that if any devisee under the will should contest it or seek to invalidate any of its provisions, his or her claim to any interest in the testator's estate should forfeit, and such interest should become a part of the residuary estate.

The codicil provides that if the testator shall survive Mrs. Elizabeth Scott, all of the property devised to her under the will shall go to Winfield Scott, Jr., subject to the same conditions imposed in the devise made to him in the will.

The inventory of the estate filed by the executors recited that all of the property included within it was the community property of the testator and Mrs. Elizabeth Scott, and that she reserved the right to thereafter determine whether she would elect to accept under the will or claim her community interest.

The last illness of the testator was of about three weeks duration. Mrs. Townsend was then living at Denver, and was not informed of her father's illness until she received a telegram from his private secretary on the day of his death, sent on the preceding day to Denver and forwarded to Kansas City, where she was visiting. During such illness the testator called for his daughter, but according to the testimony of Mrs. Scott she was not sooner notified of his condition because

·of the attending physician's assurance that his illness was not serious, the physician testifying that he did so advise Mrs. Scott.

Evidence was introduced indicative of hostility upon the part of Mrs. Scott toward Mrs. Townsend, extending over a considerable period. Mrs. Scott testified that their relations were pleasant and that she entertained feelings of parental regard for Mrs. Townsend at all times. It does not seem to be disputed that Scott cherished an affection for his daughter, Mrs. Townsend, and it was shown that he had expressed an intention to make liberal provision for her in his will. Other evidence was to the effect that he desired the bulk of his property to go to his minor son, Winfield Scott, Jr., and that he made his will to accomplish that purpose; that he was satisfied with it, and desired that its provisions be carried out. The Court of Civil Appeals has also found that there was direct and positive evidence in the case tending to show an effort on the part of Mrs. Scott to unduly influence the testator to so make his will as to exclude Mrs. Townsend from a share in his estate.

The principal question presented by the petition for writ of error is that of the admissibility of certain declarations of the testator, testified to by various witnesses tendered by the contestant, admitted by the court as probative of the state of his mind at the time of his execution of the will and therefore competent as tending to prove that the alleged undue influence was effectively exercised and produced the will as its result, an essential part of the issue made by the contest. It is unnecessary in this case to enter upon any general review of the subject of the competency as proof of the declarations of a testator· in a will contest, a subject, it may be said, which has commanded as much attention and upon which there has been expressed as much pronounced diversity of view as any within the entire field of judicial decision; but that there may be no confusion in applying to these declarations the rule of this court upon the subject, it is important that there be no doubt as to what is the rule. Its determination is deemed advisable, therefore, at ·the threshold of the case, a course suggested by the conflict of views urged in the argument both in relation to the true rule and its application, as well as to the effect of previous decisions of the court.

In Johnson v. Brown, 51 Texas, 65, the immediate question was the admissibility of a testator's declarations indicative of his feeling toward the beneficiaries named in a will contested upon the ground of forgery. It was held that in such a case his declarations, before and after the date of the proposed will, expressive either of feelings of ill-will or kindness toward the beneficiaries are admissible, not in disparagement of the will nor as proof sufficient in themselves to overcome the testimony of the subscribing witnesses, but as evidence of an independent collateral fact—the state of feeling between the parties—and therefore tending in some degree to prove the issue before the court. The case did not involve declarations of a testator offered upon the issue of undue influence to show his state of mind at the time of the execution of the will and as tending to prove the subjection of his mind to such influence, but in the discussion of the question before it the opinion of

the court plainly expresses assent to the rule that where undue influence, as distinct from mental incapacity, is the issue, and is independently proved, declarations of the testator expressive of a mental state produced by such influence, whether made contemporaneously with 'the execution of the will or within a reasonable time before or after its execution, are admissible as an aid in the determination of the question of his free agency in making the will.

In Robinson v. Stuart, 73 Texas, 267, 11 S. W., 275, where the issue was both undue influence and mental incapacity, it was held that declarations of a testator, there shown to have been made in a letter written before the execution of the will, indicative of hostility toward the principal legatee, are admissible, Johnson v. Brown being cited in support of the ruling; as well as Kennedy v. Upshaw, 66 Texas, 450, 1 S. W., 308.

In McElroy v. Phink, 97 Texas, 147, 76 S. W., 753, 77 S. W., 1025, the proceeding was to probate a will alleged to have been lost. Its probate was contested upon the ground that the will had been revoked by the testatrix. Her declarations that she had sent for the will and destroyed it, as well as her declarations complaining of ill-treatment at the hands of the principal beneficiary, were held to be admissible as tending to prove that the testatrix had revoked the will. In Chief Justice Gaines' opinion in that case Kennedy v. Upshaw, 64 Texas, 411, holding as inadmissible a declaration of a testator made after the date of an alleged codicil which was charged to have been forged, to the effect that he had not changed his will, was reviewed, as was also Throckmorton v. Holt, 180 U. S., 552, 45 L. Ed., 663, 21 Sup. Ct. R., 474, holding that a testator's declarations, not a part of the res gestae, were not admissible upon the issue of forgery and, as evidencing a state of mind, are competent only where the issue is his mental capacity. Kennedy v. Upshaw was apparently distinguished upon the ground that the declaration there considered amounted to the statement of a mere legal conclusion; and Throckmorton v. Holt was distinctly not followed, its doctrine being in effect clearly rejected by the conclusion reached and announced by the court upon the question before it, in support of which Johnson v. Brown and Tynan v. Paschal, 27 Texas, 286, 84 Am. Dec., 619, were cited.

These decisions very plainly indicate the repudiation by this court of the theory that the test of the competency of a testator's declarations, not a part of the res gestae of the making of the will, is whether the issue of mental capacity is present in the case, or that where the issue is undue influence alone, such declarations are incompetent, generally, to show the testator's state of mind at the time of the execution of the will unless there be proof also of his mental weakness. Rankin v. Rankin, 105 Texas, 451, 151 S. W., 527, which has been strongly urged by counsel for the plaintiffs in error, marks no departure from the court's rule of decision upon the subject. The opinion in that case of Chief Justice Brown quotes from Throckmorton v. Holt, whose holding the court had declined to follow and apply in McElroy v. Phink, the quotation in some respects expressing a view antagonistic to that of this

court as announced in previous decisions, and in others declaring a rule of general recognition. The case, however, is authority for what it decided rather than for the quoted views of another court which had been rejected by our own decisions. The issues both of mental weakness and fraud and undue influence were made bv the pleading in the case as the basis of the attack upon the deed, which was dated November 24, 1898. The Court of Civil Appeals had found that at the time of the execution of the deed Mrs. Charlotte Rank'n was over seventy years of age and for some time prior to its execution had been in feeble health and weak in mind; but this court held there was no proof of the practice of fraud or undue influence upon her in the making of the deed. In this state of case the actual decision of the court was, that her declarations, made in May or June, 1899, concerning the fraud, did not tend to prove that her mind was weak when she made the deed; that the witness testifying to the declarations also testified that her mind was clear at the time she made them; that the declarations themselves evidenced her clear recollection of the details of the transaction; and that if they were untrue and simply the expressions of a disordered mind, they presented no reason for disturbing the conveyance, "because there was no proof of fraud or undue influence." Under the distinct holding of the court that there was an absence of any proof of undue influence, all question as to the admissibility of the declarations was removed, since the rule is general that such declarations are not competent as proof in themselves of the influence. The case is not authority for the proposition, since it in nowise assumes to decide the question, that where undue influence is independently proved, a testator's declarations, made within a reasonable period from the date of the execution of the will, indicative of his mental state at that time and of the operation of the influence, are not competent as proof of the effect of the influence upon his mind. On the contrarv, the decisions of this court clearly support the view that they are admissible, under the circumstances just stated, for the purpose of showing the testator's state of mind, and regardless of the issue of mental capacity.

The nature of the issue makes this conclusion inevitable. The law recognizes undue influence in the procurement of a will as a distinct ground for its avoidance. In its essential elements it has no real relation to the ground of mental incaracitv. Testamentary incapacity implies the want of intelligent mental power. While undue influence bespeaks in itself the existence of a mind of strength sufficient to make a valid will if unhindered by the dominant influence, and such a mind as would have produced a valid will but for the coercion or restraint to which it was subjected. The issue is proved only when free agency is shown to have been supplanted, which means a testament made under such subjection or surrender of the natural freedom of will and action as that it speaks the mind of another. It is not necessary that the mind be reduced to a state of incapacity, for the invalidity of the will may then be established upon that ground alone. It is sufficient, though the mind be capable to the full extent that the law requires

testamentary capacity, if as a result of the exertion of the influence independence of volition be overcome, liberty to act subdued and freedom of will be therefore subverted. Conditions at once suggest themselves where under the operation of such influence free agency is yielded knowingly, as the result of mere weakness of character or under the emotion of fear or through the desire for peace, where the mind succumbs to a force of such power as reduces it to a state of subjection, but where the exercise of free will is renounced with recognition of the presence of the superior force and under the consciousness of the surrender. In such cases all idea of mental weakness is repelled. On the contrary a capable mind is necessarily presupposed. It is true the fact that free agency is overcome implies weakness in anyone who yields it, but it is not essentially a weakness of mind, though mental weakness may exist and materially contribute to the successful operation of the influence, a condition probably urged as concurring in most of the cases in which the issue is found. But it may as fully imply weakness of character, as distinct from mere weakness of mind, or any other condition whereby the will is rendered susceptible to the influence employed.

Remembering that all evidence is of necessity according to the subject matter of the inquiry, when the nature of the proof entitled and necessary to be made under the issue comes to be considered, it is equally plain that where undue influence is otherwise proved the testator's declarations, if indicative of his mental condition at the time of the execution of the will as presumably produced by the operation of the influence and made within a period not too remote from that time, fall entirely without the hearsay rule and are admissible as original evidence. This proceeds from the condition of the issue being only partly proved where the fact of the existence of the influence or its attempted exertion is alone established, and never fully proved unless it be further shown that it was effectually exercised, its purpose accomplished and the will thereby produced. The presence of those things which may ordinarily constitute such influence, conditions favorable to its efficient operation, and effort to subdue the will of the testator by its means, may all be shown to have concurred; yet if in the face of them the mind of the testator was unswayed from its own independent course, pursued its own bent, maintained its own integrity of purpose and produced a will in accord with his own wishes, the testament is valid and the law will protect and enforce it, even though it be such in its provisions as was sought to be procured.

How then under the issue is the further essential fact,— that the influence was successfully practiced, to the subversion of the testator's free agency, and produced the will as its result, to be established or disproved? His declarations that the will was thereby procured, or that the instrument was not his will, or his statements of like nature are, of course, inadmissible, since his declarations are not competent to prove the fact of undue influence, or as direct evidence that it produced the will. But where there is competent evidence of the exercise of undue influence, the issue as to whether it was effectually exercised

necessarily turns the inquiry and directs it to the state of the testator's mind at the time of the execution of the will, since the question as to whether free agency is overcome in its very nature comprehends such an investigation. The ascertainment of his state of mind at the time of the making of the will, affords, in other words, a means of determining whether the influence was successfully exerted; and the question then narrows to whether his declarations are competent to establish his state of mind. Here we know from human experience that conduct is not an absolute criterion for determining whether the mind has acted freely or under constraint, working out its own intentions or merely expressing the dominance of a stronger will. By itself it furnishes at best only a partial standard of the state of a man's mind, and therefore only an imperfect light for the inquiry, because mere acts, while generally speaking loudly, do not always speak truly, and judged by themselves are so subject to misinterpretation as to preclude their acceptance as an entirely reliable test. All other evidences tending to disclose the mental condition under which the will was made are, accordingly, not to be rejected, but such as may reasonably be depended upon should be recognized and availed of. While the mind does not always express itself fully and truly, or reveal its actual state, in what a man says, such is, nevertheless, the more common form of its expression, and hence a usual indication of its condition; and, with the exception of conduct, it affords, generally, the only method we have of ascertaining the mental state under which a particular act is done. As a means, therefore, of determining the mental state at such time, voluntary declarations, indicative of it, rest upon as sure a ground as any which the inquiry provides; and properly come within that class of unsworn declarations to which the law gives the character and probative force of original evidence upon certain issues because, from their nature, they admit of no better or more reliable proof.

The important consideration to be observed, however, in this connection is, that the declarations be such as reasonably tend to disclose what the state of the testator's mind was at the very time of his making the will. If, for instance, they are shown to have been made at a time not in reasonable proximity to its execution, their remoteness condemns them as any efficient or trustworthy aid in determining what his state of mind then was, and they should be excluded for that reason alone. Furthermore, though they are shown to have been made within such reasonable period, unless they are reasonably indicative of what his mental state was at that time, they constitute no evidence upon this part of the issue and should be rejected. The alleged acts of undue influence or attempts to practice it, the attitude toward each other of parties affected by the will, and other matters of that kind, though relevant to the main issue, can no more be proved by recitals found in the testator's declarations than through the unsworn statements of any other person. His declarations concerning such matters are hearsay, just as they would be if made by any other third party. At this stage of the proceeding the law is concerned solely with ascertaining what

. the state of his mind was when the will was made. Such of his declarations as tend to disclose it fall without the hearsay rule because they are of probative force upon that question and, from the nature of the inquiry, are of the best evidence capable of being produced. But to avoid the admission of purely hearsay testimony it is but proper to require that the declarations offered to prove the mental condition of the testator be of such nature as tend to reveal it by being in themselves expressive of his mental state. By the observance of this rule his declarations are permitted to perform their rightful office in the trial, but are denied use for those purposes for which they are incompetent.

We have thus dealt with the general question in an effort to present what we conceive is the true relation and proper use, as evidence, of a testator's declarations in a will contest based upon the ground of undue influence. It is one of great importance and deep interest, and is not without its difficulties, as is evidenced by the division of the best minds that have sought to determine and define the correct doctrine upon the general subject. But it seems to us that these views result as the logical conclusion of sound reasoning upon the question; that they are confirmed, as well, by established authority; and will insure the application of right principles to the declarations we will now proceed to consider.

Rose Hill, the negro woman employed as a nurse for the minor son of the testator, was permitted to testify as a witness for the contestant, over objection, that just before the family went to Europe in June, 1909, he testator said to her that "Mrs. Scott had been after him to make a will." In permitting this declaration of the testator to be proved the trial court instructed the jury that it was admitted only for the purpose of showing or tending to show, if it did, the condition of the testator's mind at the time of the execution of the will, and should be considered for no other purpose. A charge to the same effect, in substance, was given, embracing in its reference all of the declarations of the testator admitted in evidence. Rose Hill is shown to have been an important witness in the case. She had previously testified to an occurrence upon the boat between the testator and Mrs. Scott during the return trip from Europe early in September of the same year, on the 29th of which month the will was made, when, according to her testimony, "there were some very important papers mentioned by Mrs. Scott, and Mr. Scott did not seem to be very anxious to sign some papers; I don't know what it was. Mrs. Scott had some business she wanted him to attend to; I don't remember what it was; I can not say exactly what it was, but I know she threatened him with taking the child away from him if he did not sign the things she wanted him to do; threatened to take Winfield, Jr., away from him." The theory of the contestant was that the will was the paper Mrs. Scott was endeavoring to have her husband execute, according to the testimony just related; while Mrs. Scott testified that there were no business papers or instrument of any kind that she asked the testator to sign while they were on

the ship, other than an agreement for the settlement of a certain business controversy on account of which it was thought he stood in some danger of his life, which she said she had all the time importuned him to sign. Rose Hill. had also previously testified that just before the testator left St. Louis for Fort Worth, where a few days later the will was made, Mrs. Scott. requested her to leave the room with the boy, where she and her husband were, saying that "she had some business matters that she had to attend to or some business papers that she wanted Mr. Scott to see to while he was in Texas."

The testator's declaration, testified to by this witness, that "Mrs. Scott had been after him to make a will," was cleary inadmissible. It was but a naked statement of fact, a plain narration of a past occurrence, which Scott's declarations were wholly incompetent to prove. Such a statement made by him as to what his wife had been trying to get him to do was as certainly inadmissible as a similar statement by any other person. The effect of its admission was to permit the use of his declarations for the purpose of establishing an effort by Mrs. Scott to have him make his will, or, in the light of the issue in the case and other testimony such as we have referred to, an attempt by her to exercise the undue influence charged, since under the allegations to induce the testator to make his will was essentially the prime object for which it was exerted,—a purpose for which the law emphatically says a testator's declarations can not be used, as upon such issue they are purely hearsay. Underhill on Wills, sec. 161.

The limitation placed upon the testimony by the court at the time of its admission and by subsequent instruction, that it was to be considered only upon the question of Scott's state of mind, was from the nature of the declaration itself, ineffectual, since it sought to limit the testimony to an issue it in nowise tended to prove. An attempt to limit the testimony to a certain purpose is a vain proceeding, as the minds of men ordinarily operate, unless the testimony in itself at least suggests the purpose and is capable of being appropriated to the consideration of the question to which it is in terms limited. The mind recognizes the distinction of impression created by a particular statement which conveys a dual idea, and is perhaps capable of confining its operation to the consideration of one of such impressions to the exclusion of the other's effect; but whatever be the attempted limitation, it is not so constituted as to exclude the certain effect of a given statement where it is the only effect of which the statement is susceptible.

In what way did this declaration of the testator, that "his wife had been after him to make a will," tend to prove his state of mind, either at that time or when the will was made, so as to subject it to consideration upon that question to the exclusion of other issues? Or, in the use of the expression that she had been "after" him, how was it capable of conveying to the minds of the jury any other idea than that his wife had been importuning him to make his will or had been engaged in a persistent effort to that end? Did it suggest any fear or

awe upon his part, or any state of coercion or subjection from any cause under which his mind or will rested? Did it indicate any mental condition, whatever, or anything pertaining to his mind beyond the mere faculty to remember the occurrence and the ability to express his thought, common to every ordinary narrative statement? In an effort to discover from it some indication of a state of mind produced or operated upon by an undue influence, to discern some effect upon the mind that such an influence might cause,—and unless it affords such an indication or discloses such an effect the incompetency of the testimony is not open to question,—what evidence of that nature does this declaration reveal? It is a patent statement of previous action on the part of his wife; but wherein does it indicate any mental state of his own, or any effect produced upon him by that or any other action or conduct of his wife? Here, on the question for which alone it was competent, if at all, it is altogether silent, disclosing neither emotion nor any character of constraint of mind, and giving no suggestion that this action of his wife or any previous conduct on her part had produced any effect upon him, one way or another. The declaration does not purport to signify any mental attitude of the testator; it, in effect, withholds any such expression. It bears upon its face only the semblance of a naked recital of an effort by the testator's wife to have him make his will; is proof of nothing beyond that; and nothing else in our opinion can be deduced from it. To say that it anywhere betrays other than an ordinary mental condition, such as is common always when men narrate occurrences relating to themselves, is to impose upon the declaration a character it does not possess and extend to it an effect of which it is not fairly susceptible.

The argument has been made that the fact alone that the testator gave utterance to the declaration was proof tending to show the effect of the alleged undue influence upon his mind; or, in other words, that the fact that he said to this witness, in June, 1909, that "his wife has been after him to make a will," tended to show that his mind was under her influence. This course of reasoning is probably ingenious but is unsound, unless we are prepared to admit that any recital by a man of something his wife or some other person had been trying to get him to do, is for the same reason indicative of a condition of mental constraint. We know, however, that such recitals in themselves convey no such indication, and common reason forbids any such significance being attached to these. If the bare narration of another's importunity is to be received as an evidence of mental coercion or restraint, the validity of any will is subject to be determined according to the mere discretion of the testator's utterance rather than the exercise of free agency in its execution. No reference could be made to only the commonplace confidences of the marital relation except at the peril of such a statement being later used as a revelation that one of the parties had been victimized into a state of mental humiliation and subjection. The oftener the husband or wife might speak of the other's desires or efforts, in regard to those things that might properly concern them both, the stronger

proof would it afford, not of that normal respect and deference of which such expressions are a usual token, but of an unnatural condition induced by a sinister influence. The law recognizes that that or any other close relation may prove favorable to imposition. It permits the use of declarations of a testator as evidence of his state of mind where they serve to indicate a mental condition. But when the declaration is but the narration of a particular circumstance in regard to even a very important matter, and no hint or suggestion is given of any uncommon effect produced upon the mind by that which is related or of any unusual mental condition, it should indulge, we think, no such finely wrought theory as that which assumes that it is some undue state of mind which provokes the narrative. If a declaration by a testator that the party charged with having practiced the undue influence had sought to have him make his will, is competent to show his state of mind, his naked statement of any other fact in relation to the exercise or the attempted exercise of the influence would be equally competent for the same purpose under this theory. According to it, the effect of the fact related would be the force in each instance which provoked the comment, and the fact of the comment would, therefore, be evidence of the effect. We would quickly reach the result of every such declaration being rendered admissible under the guise of showing the state of the testator's mind, though it indicated none other than an ordinary condition, and the hearsay rule against such declarations would soon succumb to the operation of the exceptions made to it.

That this incompetent testimony was likewise prejudicial to the plaintiffs in error is in our opinion not open to question. It afforded direct proof through a statement made by the testator himself of one of the most important features of the issue in the case. The theory of the contestant being that the exertion of undue influence by the testator's wife produced the will, proof of effort on her part to have him make it necessarily supplied a strongly persuasive circumstance in support of that position. It was as cogent a fact as could be produced to establish the exertion of the alleged influence, since under the issue it was subject to be construed both as an attempt to practice it and as expressly marking its direction toward the object of its alleged exercise.

Incompetent testimony of such force and capable of such effect under this issue can not in our judgment be treated as harmless. A legal trial is as important as a correct result. We have no disposition to lightly reverse the action of a trial court. Without any tendency to emphasize errors that are immaterial its judgment should be accorded the presumptions the law imparts to it. But the rules of law, by whose observance only can rights be legally determined, are entitled to the same deference, and have an equal claim upon the conscience of a court.

James W. Coffee, a witness for the contestant, was permitted to testify to a declaration of the testator made to him in the spring of 1909 which included the statement, "that his wife had always wanted him to make his will, and that his wife did not like Georgia," meaning Mrs. Townsend, the contestant.

Jan. L. Forrester, a professional nurse, who is shown to have attended Mrs. Townsend in Colorado Springs, Colorado, in June of 1907, was permitted to testify to a declaration made by the testator to her upon the occasion of a visit to his daughter at that time, which included the statement, "If I mention Colorado or coming to see Georgia (Mrs. Townsend) Mrs. Scott gets up some excuse to keep me home"; and upon the witness asking what Mrs. Townsend had done to Mrs. Scott to make her feel that way toward her, he stated, "She was a mere child and that Mrs. Scott would raise hell if he mentioned it."

John F. Baker, Jr., an agent for the testator and in charge of his correspondence in November, 1906, was permitted to testify to a declaration made by him at that time to the witness in respect to keeping his mail from Mrs. Scott unless he was there, which included a statement, "that there was a feeling between Mrs. Scott and his daughter which it was unnecessary for him to go into."

Floyd E. Singleton, who was in his employ as a stenographer, testified to a declaration of the testator made in April or May, 1910, which included the statement "that Mrs. Scott and Mrs. Townsend did not like each other, and that Mrs. Scott did not like Mrs. Townsend."

The testimony of the witness Coffee of the testator's declaration "that his wife had always wanted him to make his will" was inadmissible for the reasons we have above stated in reference to the testimony of the witness Rose Hill. The statements made by the testator that we have above quoted from his testimony and that of the other witnesses just named, indicating a hostile or unfriendly attitude on the part of Mrs. Scott toward Mrs. Townsend were also hearsay in their character and should not have been admitted over objection. The feeling of Mrs. Scott toward Mrs. Townsend could not be shown by the testator's declarations; and proof of her feeling toward her step-daughter did not tend to establish the state of his mind.

The statements of the testator, testified to by the witnesses just named and above quoted, were, as shown by the bills of exception, apparently but parts of particular entire declarations made by the testator testified to by them, the other portions of which were not incompetent in our opinion. In each instance, however, the particular declaration, of which the statement we have quoted was a part, appears to have been offered as a whole,—at least it does not appear that the unobjectionable part was offered separately,—and being inadmissible in part, should have been excluded, upon objection, or else the trial court should have permitted the introduction of only so much of it as was admissible. Robinson v. Stuart, 73 Texas, 267, 11 S. W., 275.

The bill of exception relating to the foregoing testimony of the witness Coffee contains other distinct declarations of the testator, expressive of affection for his daughter, Mrs. Townsend, and her son and an intention to provide for both of them in his will. Such declarations were admissible. Johnson v. Brown, 51 Texas, 65; Underhill on Wills, sec. 161. The bill does not show that the declaration which included the objectionable statement to which we have referred in the testimony

of this witness, was separately objected to. It simply discloses an objection apparently urged against all of his testimony, including the declarations which were good as against it, as well as the one which was properly subject to it. We would not hold in this state of the record that reversible error was committed in admitting the objectionable testimony of this witness, since, as the declarations were distinct, it was the duty of counsel to indicate by their objection that which was incompetent. When the declarations taken all together were objected to as a whole, as appears from this bill of exception, under the established rule the court was under no obligation to separate the testimony and apply the objection to only the inadmissible part of it. This can not be said, however, in respect to the testimony of the witnesses Jan L. Forrester, Baker and Singleton, to which we have above alluded. We think it is proper to treat the bills of exception relating to their testimony as respectively showing the tender by the contestant of a distinct declaration of the testator, offered as a whole and against which, therefore, one objection could be properly leveled, which was done. What was testified to by these witnesses as having been said to them by the testator very clearly appears, we think, from these bills of exceptions, to have constituted, in each instance, an entire declaration made by him at the time, one connected and related statement, though composed of more than one sentence, and offered by the contestant as such. Where a declaration so appears to be entire and so offered, there could be no occasion for requiring separate objection to the several parts of it.

The testator's declarations indicative of his feelings toward his daughter were clearly admissible, as we have stated. The testimony of the witness, Mrs. Squire, of declarations of the testator made in October, 1909, set forth in the twenty-first and twenty-second bills of exception and complained in the fourth assignment in the application, was of that character and therefore properly admitted.

The testimony of the witness Rose Hill as to the occurrence between the testator and Mrs. Scott on the ship during their return trip from Europe in September, 1909, to which we have before referred, was competent. It tended to prove the issue of undue influence through the statement of the witness that Mrs. Scott was urging the execution of some important papers by the testator, which he exhibited a reluctance to execute, and that she threatened to take his minor son from him unless he complied with her wishes. That the witness was unable to identify the papers referred to in her testimony as the will of the testator, did not affect its admissibility. The occurrence was an admissible circumstance under the issue; and it was for the jury to judge of its weight and to say to what papers it was that the testimony related.

We entertain the same opinion in respect to the further testimony of this witness, which is made an additional ground of the application for the writ of error, to the effect that "Mrs. Scott had several times threatened her husband to take their son and go away if he did not do the things she wanted done; and that he never wanted to do the things she asked him to do, and that she stated that quite often; and that Mr.

Scott said if Winfield was fourteen years old he would take his child and go himself." This was proof of a circumstance relevant to the issue in the light of other testimony in the case. Evidence having been adduced of what appeared to be a threat by Mrs. Scott to take his boy from the testator unless he signed certain important papers, which it was within the province of the jury to say related to the testator's will, other evidence tending to establish a disposition upon her part to so threaten him as to things she desired him to do was thereby made relevant. It was admissible as a circumstance to show an inclination or tendency to compel in that way the doing by the testator of what she wanted done, to be considered by the jury in connection with other testimony in the case in determining whether the will was the result of the employment of such means. Where it is sought to be established under this issue that a person had such power over the testator as to constitute undue influence, a proper step in the process is the production of evidence of his disposition, through the proof of other such instances, to use coercive means toward the testator for the accomplishment of his purposes. Lewis v. Mason, 109 Mass., 169. The issue admits, generally, of only evidence circumstantial in its nature; and while such a circumstance as this would be remote under different conditions, it in a sense portrayed here, if true, a domineering attitude assumed by the testator's wife toward him in relation to things she wanted done, in the light of which the contestant was entitled to have considered her acts introduced in evidence as immediately relating to the will.

Testimony offered by the contestant of certain statements or declarations of Mrs. Scott made out of the presence of the testator, was permitted. In the main they were expressive of hostility or unfriendly feeling on her part toward Mrs. Townsend. One of them, stated to have been made shortly after the marriage of the testator's daughter to John T. Carter, was, "I am certainly glad that Georgia has married and that it has happened, because Mr. Scott promised me to cut her off entirely." Another, stated to have been made in 1907, was, in substance, that "she did not want Mrs. Townsend and her husband to come to the Fat Stock Show at Fort Worth, to which the testator had invited them; that she and Georgia were not very friendly and she did not like her; in fact, she did not like any of Mr. Scott's people; that they were not her kind; that the testator had done too much already for Mrs. Townsend and that she did not want him to do any more; that what Mr. Scott had at that time belonged to her and Winfield, and that testator had already given Mrs. Townsend all that she was entitled to at the time of her mother's death, and she did not want him to give her any more; and that the testator had already promised her that he had made all the provision he was going to make for her." Another was stated to have been made after the occasion of a visit by Mrs. Townsend's husband to the Scott home in St. Louis in 1909, at which time, according to the witness, Mrs. Scott said that "Mr. and Mrs. Townsend need not be watching around to see what they could get out of Mr. Scott, because she would see that they did not get any more than they

had." And another was stated to have been made after a visit of Mrs. Townsend, then Mrs. Carter, shortly after the birth of Winfield Scott, Jr., to the effect: "What did Georgia say about the baby? I bet Georgia feels like killing that baby because she knows she isn't going to get this out of Mr. Scott's estate now." And a further statement was testified to as having been made when Winfield Scott, Jr., was about six months old, in substance, "that her boy was going to be a millionaire boy because he was going to get all those blocks on Main Street, in Fort Worth; that Miss Georgia had always displeased her father and she did not think she could get very much out of the property."

It is strongly urged against these declarations that as Mrs. Scott was only one of the beneficiaries under the will and at the time of the trial had not elected to take under it; that as the principal beneficiary was Winfield Scott, Jr., an infant incapable of collusion to accomplish the making of an improper will, and whose interest under it was several, such statements of hers, which would inevitably affect his interest, were not admissible. This testimony presents probably the most difficult question in the case as determinable by the authority upon it. It may be said that the weight of authority is to the effect that as a general rule where attack is made upon the will as a valid instrument and not upon a specific bequest to the one whose declarations are offered, and there are other interests which will be thereby affected that are several from that of the declarant and existing in favor of those not in collusion with him, the declarations or admissions of such legatee should not be permitted, upon the ground that the interests of such innocent legatees are not to be destroyed through the instrument of his statements. There is a marked conflict of authority upon the question. That such is the weight of authority has been questioned. In re Arnold's Estate, 147 Cal., 583, 82 Pac., 252. A careful consideration of the question aided by a thorough examination of the authorities upon it, has convinced us, however, that as applied to a case of this character, with the issue as it is, and under the relation of the parties, particularly that existing between Mrs. Scott and the principal beneficiary, her minor son, declarations made by her as the party charged with having wrongfully procured the will with the design of excluding the contestant from any substantial share in the estate, of the nature shown, indicative of hostility toward the contestant and the harboring of such design, were admissible for that purpose. The fact of such hostility and design is always provable under this issue as an essential and, in most instances as an indispensable, part of the contestant's case. That it may injuriously affect an innocent interest presents no obstacle to the making of such proof. It is a feature of the attack to which, in such a case, all interests affected by the will are subject. A valid will is necessary for them to have any legal standing; and no interest, therefore, can claim exemption from the force of competent evidence to establish that the will, as a testamentary instrument, is invalid. In a proceeding of this character it is the will as an entire instrument, whose validity is only prima facie in the contest, in other words, the very basis of the

right to every interest affirmed under it, which is sought to be impeached. There is necessarily involved in the very issue on trial the question of whether any interest exists under the will; and it is of doubtful correctness to say in such a case that any beneficiary has acquired under it an interest of such vested character as to make inadmissible against him any relevant fact or circumstance tending to establish its invalidity, that under the issue is admissible against the legatee who is charged with having wrongfully procured it.

The fact of hostility of a beneficiary charged with the wrongful procurement of a will, toward one excluded under it, and his design to accomplish such exclusion, being necessarily provable, in such a case, against every interest claimed under the will, how may it be properly proved? We know that in the general sense it is only capable of being fully proved by showing not only the conduct of such a beneficiary but by evidence of his statements, as well, in that connection. Are such declarations hearsay as to another beneficiary, not involved in the alleged wrong and whose interest under the will is several, but who is before the court seeking to uphold it? Whatever might be affirmed as a general rule upon the subject, it is clear to us that, for the purpose we have stated, these declarations of Mrs. Scott are not to be here so considered. A part of the design charged against her in the case was to procure a will in which her son would be a principal beneficiary, as well as containing favorable provision for herself. A part of her purpose is alleged to have been directed to the disinheritance, practically, by the testator of the contestant, his daughter. To accomplish both purposes she is charged with having procured the will by her exercise of undue influence over him. She was a party to the suit and proponent of the will. Under these circumstances her declarations, tending to show hostility on her part toward the contestant and a design to bring about her exclusion from the estate, and therefore affording proof of motive for the exertion of undue influence over the testator, were admissible both against herself and the other beneficiary for the purpose stated, though we think it proper for the court to limit the testimony accordingly. We do not regard it as necessary to review the authorities cited upon the question by the plaintiffs in error. Some of the cases do not relate to the question as it is here presented, though others directly support their position. There is marked conflict, as we have said, upon the general question; but the following may be cited in support of this holding: Williamson v. Nabers, 14 Ga., 286; Gibson v. Sutton (Ky.), 70 S. W., 188; Shepardson v. Potter, 53 Mich., 106, 18 N. W., 575; Brown v. Moore (Tenn.), 6 Yerg., 272; Crocker v. Chase, 57 Vt., 413; Peeples v. Stevens (S. C.), 8 Rich., 198, 64 Am. Dec., 750; Muller v. Helderman, 87 N. C., 471; Lundy v. Lundy, 118 Iowa, 445, 92 N. W., 39.

On account of the erroneous admission of the testimony we have indicated, the judgments of the District Court and the Honorable Court of Civil Appeals are reversed and the cause remanded. We have discussed the other testimony as a ruling for the further trial of the case.

That. made the subject of assignments of error in the application we have not discussed, we regard as having been properly admitted.

*Reversed and remanded.*